All right, we're ready to proceed to the next case, which is Cooksey v. Futrell. Mr. Rose, we'd be glad to hear from you. Thank you. Good morning, and may it please the Court. Steve Cooksey has standing. He stopped speaking after the State Board investigated him and told him in this red pen review that what he'd written on the Internet was illegal. That is the free speech injury of chilling. The District Court should be reversed, and this case remanded for hearing on the merits. The District Court erred in concluding that individualized advice is in speech and therefore that regulations on advice don't cause free speech injuries. That was wrong. This is a First Amendment case because individualized advice is speech. In 2010, in Holder v. Humanitarian Law Project, the Supreme Court unanimously rejected the exact argument the Board is advancing here, that advice is a form of conduct and not speech. This Court just recognized as much in the fortune-teller case we identified in the 28J letter, holding that fortune-telling is a form of individualized advice that is within the First Amendment. Now, if the—I'm sorry, Your Honor. We're talking about a public health issue here, and as to count three, I believe he was compensated. If that's true, wouldn't that become professional speech and therefore not protected by the First Amendment? No, Your Honor. A couple of responses. First, speech does not lose its First Amendment protection merely because it is compensated. Number two, the degree of First Amendment protection is a merits question, and it's something the Court doesn't need to address in order to dispose of this claim. Under this Court's decision in Bowman, which is the source of the professional speech doctrine in this circuit, that was a First Amendment decision on the merits. The accountants lost on the merits, but the Court didn't hold that the accountants lacked standing in the first instance, even to bring their claim. So Bowman and the professional speech doctrine cannot be a basis for finding that Steve Cooksey lacked standing on any claim. Now, if the First Amendment applies to the deadly serious advice to designated foreign terrorists, as in humanitarian law project, and the First Amendment applies to the completely frivolous advice of a fortune teller, as this Court just recognized a few months ago, then it must be true that the First Amendment applies to Steve Cooksey's individualized advice to do things like eat more avocados and less bread. Now, let me briefly turn to the nature of Steve Cooksey's First Amendment injury, which is chilling. Mr. Cooksey suffered the injury of chilling because it was objectively reasonable for him to stop speaking after he discovered that his individualized advice is prohibited by statute, made a crime, and after the State Board investigated him, told him page after page in red pen that what he had said was illegal, and then after he stopped speaking, the State Board said, now that you've stopped, we're going to keep an eye on you. You indicate he stopped speaking, but his website is still up. Is that correct? That's true, Your Honor. In what ways did he stop speaking? He stopped speaking in three ways, Your Honor. First, he stopped doing his Dear Abby style advice column. Second, he actually stopped providing individualized advice even in a private context, and he hasn't started his compensated life coaching service that he wanted to do. Now, the Board points to one instance in which they discovered that he made a two- or three-sentence comment on a blog to a person. That doesn't defeat Mr. Cooksey's chilling claim because this Court has never required a complete cessation of speech. That's this Court's decision in Blankenship v. Mansion at page 532. He has stopped speaking, and the fact that the Board is able to monitor Cooksey just by typing Steve Cooksey into Google shows why he is chilled. In the Internet age, it's extremely easy to keep an eye on him, and that's why he stopped. Well, we constantly, or states constantly, regulate unlicensed persons in the legal field, the medical field, and in this case, the dietetic field. What's so different about it? What's different, Your Honor, is that here the regulation is directly of speech. The Supreme Court and Humanitarian Law Project made it clear that individualized advice is a form of speech, and other courts that have addressed individualized advice in the different professional contexts that Your Honor has identified have recognized that the First Amendment applies. For example, the Conant v. Walters case that we cite in our reply brief involved the speech of a doctor to a patient. The U.S. Supreme Court in 2001 in Legal Services Corporation v. Velazquez recognized that a lawyer's speech in open court is entitled to First Amendment protection. We're talking about unlicensed professionals here. We certainly regulate the speech of an unlicensed lawyer, an unlicensed doctor. In this case, the state of North Carolina is trying to regulate the speech of a dietetic advisor. I agree with you entirely, Your Honor, but that is a merits issue, and this court doesn't have to reach the merits in order to dispose of this appeal, which is strictly about the justiciability of Appellant Cooksey's claim. And I would suggest that we just take one step back and look at the basic principles, Your Honor. All Steve Cooksey did was speak to people. All he did was write something on the Internet. That is speech under the Supreme Court's cases and under this court's decision in the Fortuneteller case. Now, I agree that this case raises complicated merits questions. It is a novel question of law, the degree to which the First Amendment protects the individualized advice of dieticians. But this court doesn't need to address that. The district court should address that in the first instance on a complete record. Let me just briefly discuss this court's decision in North Carolina Right to Life because it's dispositive. This court made two points in North Carolina Right to Life. One, the mere existence of a non-moribund criminal statute is sufficient to create objectively reasonable chilling. Here, Section 90-352, Subdivision 4, on its face, prohibits assessing, advising, individualized counseling. That's exactly what Steve Cooksey did. That's exactly what got him in trouble. And that's exactly what the State Board told him he must not do. In North Carolina Right to Life, this court also found that a letter from the Deputy Director of the Elections Board was sufficient to create objectively reasonable chilling. Here, we don't just have a Deputy Director, we have the Executive Director and the Complaints Committee telling Steve Cooksey, what you wrote, what you said, what you did, that's illegal. In fact, Appellant Cooksey has a stronger standing claim than this court's decision in NCRL because there, the opinion of the Deputy Director was solicited. Here, Steve Cooksey's just an ordinary guy minding his own business, communicating with people. Out of the blue, he's investigated. That becomes a three-month investigation. He writes stuff. The Board says things like, you need a license to say this. Counseling and advising requires a license. It goes on page after page. A reasonable person, an ordinary American, would look at that and say, if I keep this up, I'm going to be in trouble. All of us have been to school. All of us know that when someone gives you your own writing covered in red pen, you've done something wrong, someone's not happy, and you better cut it out. That's what Steve Cooksey did. That's the injury of chilling, and that's why he has standing. Let me just very briefly address the rightness argument that opposing counsel makes in the briefs. Rightness is really a red herring. The claims based on chilling are inherently right. They are a present injury now based on something that might happen in the future. The whole point of the chilling doctrine is to allow people to come into court, vindicate their First Amendment rights before the federal judiciary, before a final determination occurs that may result in their punishment.  I have a few questions. Is it your position that all regulations of professional speech have to survive strict scrutiny? No, Justice O'Connor. The level of scrutiny is unclear. The professional speech doctrine, despite first being suggested in a non-binding concurrence by Justice White in low BSEC, hasn't really developed, and the level of scrutiny isn't clear. In some cases involving occupational speech, such as Legal Services Court v. Velazquez, the Supreme Court has given strict scrutiny. In other cases, like National Association for the Advancement of Psychoanalysis, which we cite in our reply brief, the level of First Amendment scrutiny is unidentified, but it's clearly lower. In this court's fortune-telling decision, the court doesn't specifically recognize the appropriate level of First Amendment scrutiny other than to say the First Amendment applies, and we're confident that what's going on here is within the professional speech doctrine. Now, it bears emphasizing that this court's decision in the fortune-teller case also says on page star 23 that the fact that the fortune-teller lost on the merits doesn't mean that every professional speech context can be decided on that basis alone. This court recognized that each case presents its own unique facts and its own unique situations, and that's why remand is appropriate to allow the district court to address this novel question in the first instance. Well, do we have to agree that you have a winning First Amendment claim to reverse on standing? Absolutely not, Your Honor. This court doesn't need to address the merits at all. Indeed, this court can be skeptical of our ability to prevail on the merits. But the relevant test here is, is the chilling objectively reasonable under the circumstances? It is not. The plaintiff must prove with certainty that the plaintiff is going to prevail on the merits. The merits is something the district court should address in the first instance on the basis of a complete record. This court doesn't need to address it. All Appellant Cooksey asked this court to do is reverse and remand with instructions to allow Mr. Cooksey to proceed on his First Amendment claims. Is there a difference between your life coaching service that's offered and more general questions on the website? Yes, Your Honor. There likely is a difference on the merits. And the reason why is that the professional speech doctrine in this court pays particular attention to whether it is paid private advice. For example, in the fortune teller case on Star 19, this court says, the relevant inquiry under the professional speech doctrine is whether the speaker is providing personalized advice in a private setting to a paying client. Now, that seems to describe at least the paid life coaching. But Steve Cooksey also gives advice to people for free. His Dear Abby column not only gave advice to people for free, but was also a source of general information to the world at large. So it has a completely distinct set of First Amendment concerns beyond just the professional speech doctrine. And it's because of the complexity and the novelty of these free speech questions on the merits that the best thing for this court to do right now is recognize there is objectively reasonable chilling under this court's precedent, such as NCRL and Preston v. Leak, remand to the district court, and allow Mr. Cooksey to reach the merits of his claims. Thank you. Are you waiving the balance of your time? I'm sorry. What I mean is I will reserve the balance of my time, Your Honor, following Mr. Goodman's presentation. All right. Thank you. Mr. Goodman. Good morning, Your Honors. Clark Goodman from Wamba Carlisle in Charlotte, and I'm proud to be here today representing the North Carolina Board of Dietetics and Nutrition. These folks, by statute, are uncompensated. They're citizens. Some of them are dieticians and nutritionists. Some of them are members of the public. And they're charged with the duty of applying and enforcing the North Carolina Dietetics Nutrition Practice Act, which is designed to protect the citizens of North Carolina from unqualified, unlicensed individuals practicing dietetics or nutrition. And that's different, as explained in an affidavit from one of my clients, Brenda Bergen-Ross, who is a dietician. It's nutrition care services that you have to have a license to provide, and that's different from ordinary advice. The impression left by the advocacy on Mr. Cooksey's behalf is that he can't tell a neighbor that he thinks it's better to buy an avocado than a loaf of bread. That's a little different from nutrition care services. Their position throughout, the core of their argument, has been that this is a case about censorship of protected speech, which thereby implicates a lower threshold for standing. It brings into play the chilling doctrine. While this appeal has been pending, this circuit has decided two cases, both of them authored by Judge Duncan, which address the two core issues in this appeal, one of them being the issue of standing and one of them being the applicability of First Amendment principles to the regulation of professionals. That's the Moore-King decision involving the fortune teller and tarot card reader dealing with professional speech and the Doe v. State Board of Police on the issue of standing. Mr. Cooksey's counsel has addressed... How does Doe v. State Board of Police impact the issue of standing here? Well, Your Honor, I'm going to address that first. They wanted to go at it talking about First Amendment first, but really the Doe case, the conclusion there, really dictates that there is no standing regardless of whether this is a First Amendment case. Because in the Doe case, as Your Honor knows, that was a woman who had been convicted of what was characterized as a nonviolent sexual offense. Through no act or inaction on her part, the law changed and her categorization changed under Virginia law. And she became a violent sex offender which required registration. And in order to enter a school, she had to petition the local circuit court and she would have to petition the school board. And she did not dispute that the process for petitioning the circuit court was proper. That could be done anonymously or under a pseudonym. She contested the process for petitioning the school board because it couldn't be done anonymously. She alleged First Amendment deprivations as a result of this requirement saying, you know, I can't go to the school. This is violating my freedom of association. And I can't go to church because they have Sunday school there. It's violating my right to free expression of religion. The majority in the Doe panel said, well, but you haven't gone to the circuit court yet and asked if you can go to the school or to church. You haven't gone to the school board yet. And so we don't know yet what harm you have suffered. And in that case, Judge Keenan's concurrence makes a very important distinction that is crucial to this case as well, and that is the difference between a final decision by the initial decision maker and exhaustion of administrative remedies. We are not saying here that Mr. Cooksey needed to exhaust his administrative remedies, nor could we. The Patsy case is clear that that's not a requirement for a Section 1983 case. What we are saying, though, is that he hasn't gotten anything resembling a decision from the initial decision maker, that being the board. Are you saying we have to evaluate the merits of the First Amendment claim before we decide standing? No, Your Honor. It sounds like it. I would think we would address standing first, not the merits. Yes. And in this case, Your Honor, that's why I don't think we need to even get to the muddy waters of some of the First Amendment issues in order to decide the standing issue because in this case, the feedback that Mr. Cooksey received from the executive director of the board was not a final or formal decision by the initial decision maker. Wasn't it enough to have a chilling effect on his First Amendment speech? Well, for one thing, that assumes that we're talking about a category of protected speech, which I'll get to in a moment. We submit that it's not, although it can't be determined yet based on the fact that there's not a formal decision, and so you fall into the line of cases where you have a subjective fear. Isn't that part of the problem? They just sort of left it open-ended to him. He got communications from the executive board saying, for example, going forward you need to align your practices with the guidance provided, and that he was being investigated, and even when they said they were closing the complaint, the last communication he received from them was, as with all complaints, the board reserves the right to continue to monitor this situation. So that's certainly telling him he's going to continue to be watched by the board. How would that not have a chilling impact on an objectively reasonable person? Well, the board also noted in that communication that he appeared to be in compliance, that the investigation was closed, and the problem here is that this was handled as set out in the executive director's affidavit, which is in the joint appendix and was attached in response to the motion for preliminary injunction. As she explained, the complaint came to the board. They had to investigate. She had a telephone conversation with Mr. Cooksey. This was part of an informal process. They sent these red-lined comments on his website, and they were presented to him as comments, requests, and there was an invitation, if you disagree, give me a call. We'll talk about it, and her affidavit says, we were more than willing to talk about it and consider his position on this. He didn't ask for clarification. He didn't express disagreement. He actually just discontinued those portions of his website, at least in part. I mean, he did still give some advice there, but there was nothing further to consider at that point, and under North Carolina law, the board has to give an advisory opinion if asked. I mean, all he had to do was accept the invitation for further discussion and have this question put to the board in its entirety as opposed to this informal conversation with the director, which she has explained in her affidavit was not a decision of the board. It was not presented as a decision of the full board. All he had to do was ask. That's all he still has to do is ask, and we would have clarification as to what the issues are before this court, and that's where it starts to connect to the First Amendment issue. Strangely, I was reminded of the First Amendment issues in this case yesterday on the plane coming up here as a passenger in front of me, wheeled what looked like a fairly typical carry-on bag down the aisle, and from where I sat, it looked like it probably fit in the overhead bin, started to put it up there. The passenger wrestled with it. The flight attendant wrestled with it, and no matter how they turned it, no matter how they situated it, it didn't fit, and that's a little bit like the survey of First Amendment law that's been presented in association with this case, and we have restriction of professionals' political speech in the Berry case, retaliation against political speech and blankenship, restriction on the content of advice by licensed professionals, the Conant case, the Humanitarian Law Project case, Velazquez. We have limitations on commercial speech in the Edenfield case in which Justice O'Connor dissented, restrictions on campaign speech by lobbyists and public interest groups, and from a distance, pieces and parts of each of these First Amendment doctrines appear like they might fit, but when you put them in the bin, they don't. They don't quite fit, and that's the exact exercise that Judge Duncan went through in the Moore-King case involving the fortune teller. There they were presenting arguments about whether this was inherently deceptive speech. There were arguments about commercial speech, so arguments about whether this was a reasonable time, place, and manner restriction, whether it was content-based, and Judge Duncan looked at that and said, none of these quite fit. What this really is is a restriction on professional speech, and whereas Mr. Cooksey's counsel submits that that case should be read to suggest that there is First Amendment protection in all respects for professional speech, what that case really does is it reaffirms the Bowman decision from this court. It applies that standard from Bowman, which traces a line all the way back to Justice Jackson's concurrence in the Thomas v. Collins case through Justice White's concurrence in Lowe into Bowman. The Eleventh Circuit has followed that approach in the Locke case, and now here we have a case just from February of this year in this circuit saying that, reiterating that the state has the authority to regulate the practice of professions. That is a well-established principle, and that authority is not eroded or diminished simply because the practice of a profession in some respect includes communicative acts. And so the struggle in applying that standard is drawing the line. Where does the practice of the profession stop and public speech, public expression begin? Because that's what the First Amendment served to protect. It makes sure that the marketplace of ideas remains unimpaired by government action. And so drawing that line, this circuit has followed Justice White's guidance in his concurrence in Lowe in saying that the core of that inquiry is whether there is this personal nexus where the professional has taken the affairs of the person that they're advising in hand and acted as a professional, and that to the extent it stays within those boundaries, it's the practice of a profession subject to regulation under the state's regulation to that profession and does not implicate First Amendment protection. So as to the counts one and two, applying Bowman, when you were talking about the personal nexus which relies on Thomas B. Collins, compensation is not the only consideration as to satisfy the personal nexus, is it? Well, Your Honor, we recognize that in the Moore King decision Judge Duncan referred to providing advice for compensation, but we would submit that that is not the sole or determinative factor any more than someone could go out and practice law without a license as long as they did it pro bono. I'm fairly certain that my State Bar would not agree with that approach. And so it is the core analysis under the standard established in Bowman, which the Moore King court followed and reaffirmed, it's looking at this personal nexus between the professional and the person receiving the advice. And that's where we run headlong back into the problem with standing in this case, and that is we don't know, because the board wasn't given an opportunity, where the board is drawing the line with respect to Mr. Cooksey's activities. Isn't that a problem for you with standing? The fact that, as you say, we don't know. Mr. Cooksey didn't know still where he stood, other than that the board was going to reserve the right to continue to monitor this situation. So how is he then free from the threat of a possible penalty? Well, he hasn't been directly threatened with any particular penalty. He didn't even receive a cease and desist letter. There was no application for a temporary restraining order. There was no referral to a district attorney. All of these things are within the board's authority. And just like the plaintiff in Doe who did not petition the circuit court and who did not go to the school board and determine what can I do, and in contrast to the North Carolina Right to Life folks who actually did go to the Board of Elections and say can we do this, Mr. Cooksey hasn't asked. And so the board hasn't had an opportunity. This was done through informal communications with the director. And these are important issues for the board to determine. When this statute and this regulatory scheme was developed in the early 1990s, email was brand new to folks even on the cutting edge of technology. Certainly no one had in mind the kind of interactive websites, web logs, and online communications and social media that we have now. And this is an important issue for a board to address with respect to a circumstance like this one. And this board hasn't had a chance. And this is why the issues of justiciability, whether framed as ripeness or standing, apply to this case because for the court to jump ahead now and to accept this case and proceed on developing some sort of factual record risks injecting the court's view as to how the Nutrition and Dietetics Act should be applied to these communications before the duly authorized board has had an opportunity to weigh in on those concepts and to apply it to these facts. And that's why they're not standing now because he hasn't suffered that concrete and particularized injury as a result of a specific conclusion on the part of the board. And again, it doesn't take exhaustion of an administrative remedy. That's not what we're talking about here. There is a full-blown procedure set out in the regulations that involves letters of charges in the contested case, and that's different. And that's exactly what Judge Keenan was talking about in her concurrence here, that you at least need a decision from the initial decision maker, and we don't have that here. And in order to apply the First Amendment doctrine that would be applicable in this circuit under Moore King, you need to know what you're fighting about, what it is that he's been told that he can or can't do. And at this point, that's not clear. And discovery is not a mechanism for developing the basis for the particularized injury. You have to have the concrete and particularized injury giving rise to standing first. What would be the point of the Red Pen review if not to tell him specifically what he can and can't do? Well, as Ms. Burrell explained, it was there to offer guidance, to give him feedback, to make suggestions. And again, her final e-mail communication to him invited further discussion, and her affidavit makes it clear that she was open to that discussion and, in fact, assumed to the extent there was any disagreement, that would be the next step, is to avoid getting bogged down in a complex and lengthy administrative process where most of these situations can be resolved with common sense and informal communications. And if they're not resolved with informal communications? Then he's entitled to ask the board for an advisory opinion to say, I don't agree, this is what I want to do, what can and can't I do? And here we're not talking about censorship of a particular viewpoint. Nobody has said you can't advocate the Paleolithic diet. Nobody has told licensed nutritionists you can't advocate that diet. Even he concedes that the general tenor of the comments he received was you can't give particularized advice, which is a principle that is consistent with the law in this circuit under Bowman and under Moore King, but how it applies to his specific circumstances has not yet been presented to the board in its entirety to rule on. One final point, I see my time is expiring. I did want to address that under the Doe decision, I note Judge King's vehement dissent there. I know that there is a petition for rehearing en banc pending there, and we would submit that the concerns that are raised there would not apply here, such that the outcome of that petition and any eventual rehearing would affect the outcome here. There it seemed that the area of disagreement was in that Judge King viewed the change in the statute, that is the change in Ms. Doe's statutory status, was the starting point for identifying the harm, whereas the majority was focused on the consequences of that harm. Here, Mr. Cooksey's status has not changed. He's always been an unlicensed individual, subject to the restrictions on unlicensed individuals in North Carolina. The question is how that will be applied in this brave new world of Internet communications to the content that he wants to include on his website. Thank you, Mr. Chairman. Mr. Rose. Thank you, Your Honors. Let me address two quick points about cases up front. First, in the North Carolina Right to Life case, that was not a case in which the non-profit speaker sought a formal or advisory opinion. That's just a mischaracterization of the case. On page 709, it says that North Carolina Right to Life wrote to Yvonne Sutherland, Chief Deputy Director of the State Board of Elections, to request her opinion. She sent a letter. That was it. There was no ongoing debate. There was no requirement of an ongoing debate. It's important to remember that under the Chilling Doctrine, as Judge Thacker pointed out, it's what would an ordinary, reasonable person do under the circumstances. The gravamen of the red pen review and of the e-mail is we think what you're saying is illegal. We think what you wrote is illegal. Now, I suppose it's true that Mr. Cooksey could have written them back or called them up and tried to debate with them, but there was no question what their position was, and it's implausible to think that an ordinary guy who's not a lawyer, just an ordinary person, is going to persuade these people, who are the experts at administering and enforcing this statute, that they're wrong. The Chilling Doctrine does not require a speaker to be an expert in First Amendment law, to be an expert in North Carolina procedure, to know to bring a declaratory ruling motion before the board itself, and the Chilling Doctrine does not require an ordinary speaker to be an expert in parsing the language and behavior of bureaucrats. All the First Amendment requires is objectively reasonable chilling. Let me address the Doe case briefly. Doe just wasn't a First Amendment case. It wasn't about chilling. It was about something completely separate. It's just an opposite. The substance of the board's presentation to the court was a discussion of the merits, a question that isn't before the court and wasn't briefed by the parties. The metaphor about the bag not quite fitting, that's just a merits argument, and it's true. It's unclear how the First Amendment will protect the speech of dietitians. Dietetic advice has only been regulated in the United States since 1983, only in North Carolina since 1991, it's a complicated issue, novel questions of law, those aren't before the court. You don't lack standing because the defendant can raise questions about whether you will prevail on the merits. All he did was speak, they made it clear that what he said was illegal, when he stopped, which the board calls he's in compliance, as though that's a good thing. In compliance means you've shut up, you've stopped speaking, that's called chilling. And then the board said, now that you're quiet, we're going to keep an eye on you. A reasonable person under those circumstances would stop speaking, that's what Mr. Cooksey did, that's why he has standing, that's why the district court should be reversed, and the district court should in the first instance do what the court did in the Fortuneteller case, what the court did in Bowman, and what the court did in all of the merits decisions that Mr. Goodman cited, namely, the court reaches the merits on a full record. If there are no further questions from the court. All right, thank you, we'll come down and greet counsel. Thank you, your honors.
judges: Sandra Day O'Connor, Henry F. Floyd, Stephanie D. Thacker